IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

OCT 19 2016

JULIA C. DUDLEY, CLERK
BY: s/H. McDonald
DEPUTY CLERK

CURTIS WALLER,                    )
          Plaintiff,             )
                                 )      Civil Action No. 4:15-cv-34
v.                               )
                                 )      REPORT AND RECOMMENDATION
CAROLYN W. COLVIN,               )
Commissioner,                    )      By:    Joel C. Hoppe
 Social Security Administration, )      United States Magistrate Judge
                Defendant.       )

    Plaintiff Curtis Waller asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision denying his application for supplemental security income

("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–1383f. The case is before

me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 12. Having considered the

administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's

decision is not supported by substantial evidence. Therefore, I recommend that the Court

**GRANT** Waller's Motion for Summary Judgment, ECF No. 13, **DENY** the Commissioner's

Motion for Summary Judgment, ECF No. 15, and **REMAND** the case for further administrative

proceedings.

## I. Standard of Review

    The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v.

Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court

asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id*., but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work *See Heckler v. Campbell*, 461 U.S. 458, 460–62

2

(1983); 20 C.F.R. § 416.920(a)(4). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Waller applied for SSI on March 16, 2012, alleging disability caused by depression, nerve problems, learning disabilities, and chronic neck and back pain. Administrative Record ("R.") 90, ECF No. 9. This was Waller's second application for benefits. His first claim was denied by ALJ R. Neely Owen on September 24, 2010, R. 67–79, and the Appeals Council declined his request for review of that decision on December 20, 2011, R. 84–86. Waller's second claim for benefits alleged a disability onset date of September 25, 2010, at which time he was thirty-two years old. R. 90. Disability Determination Services ("DDS"), the state agency, denied Waller's second claim at the initial and reconsideration stages. R. 90–102, 104–117. On April 11, 2014, he appeared with counsel at an administrative hearing before ALJ Mary Peltzer. R. 40–63. The ALJ heard testimony from Waller, R. 44–57, and a vocational expert ("VE"), R. 57–62.

ALJ Peltzer denied Waller's claim in a written decision issued on April 28, 2014. R. 13–34. She found that Waller had severe impairments of lumbar spinal stenosis and mental disorders diagnosed to include major depressive disorder with psychotic features, schizoaffective disorder depressive type, and borderline intellectual functioning. R. 15. Other impairments alleged in the record, including abnormal liver enzymes, hypertension, and alcohol abuse, were found to be non-severe. *Id.* The ALJ next determined that none of Waller's impairments, alone or in combination, met or equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart

P, Appendix 1—in particular Listings 1.04 (disorders of the spine), 12.04 (affective disorders), and 12.05 (intellectual disability). R. 15–17.

ALJ Peltzer then found that Waller had the residual functional capacity ("RFC")[1] to perform light work[2] with only occasional climbing of ramps and stairs; occasional climbing of ladders, ropes, and scaffolds; occasional kneeling, crouching, and crawling; and no more than occasional exposure to workplace hazards. R. 17. As to Waller's mental limitations, the ALJ determined,

> He can perform unskilled work at an SVP of 1 or 2 in a static work environment where changes in tasks are infrequent and explained when they do occur, no more than simple, work-related decisions, and no work where pace of productivity is dictated by an external source over which he has no control, such as conveyor belts, and no tandem work assignments. He can have occasional contact with the general public.

*Id.*; *see also* R. 18–32 (explaining the ALJ's reasoning for her RFC finding). Based on this RFC and the VE's testimony, the ALJ found that Waller could perform his past work as an elevator operator,[3] or in the alternative could perform other work available in the economy, including laundry worker, textile and garment presser, and food counter clerk. R. 33–34. She therefore determined that Waller was not disabled. R. 34. The Appeals Council declined Waller's request for review, R. 1–3, and this appeal followed.

### III. Facts

### A.    *Prior to the Alleged Onset Date*

---

[1] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her impairments. 20 C.F.R. § 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

[2] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects weighing ten pounds. 20 C.F.R. § 416.967(b). A person who can meet these lifting requirements can perform light work only if he also can "do a good deal of walking or standing, or do some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1 (4th Cir. 1999).

[3] The VE testified that this job is usually performed at the heavy level of exertion, but that Waller performed it at the light level. R. 58.

4

1.      *Treatment Records*

The record reflects Waller's treatment history dating back to October 2009, at which time Waller complained that he had been suffering from chronic back pain since being in a motor vehicle accident in 1999. He was not taking any medication for pain at this time, but stated that he had treated with an orthopedist and pain management specialists in the past. Findings on physical examination were unremarkable, with no costovertebral angle ("CVA") tenderness and negative straight leg raise bilaterally. Waller was prescribed Flexeril and Tylenol with Codeine for his pain and referred to orthopedics at the University of Virginia ("UVA"). R. 334–35.

An x-ray of Waller's lumbar spine, taken on November 20, revealed normal findings, with no evidence of fracture and no focal osseous abnormalities identified. R. 299–300. On January 15, 2010, Waller visited Judy C. Broughton, M.N., F.N.P., to discuss the results of an MRI of his spine that had been taken at UVA.[4] Broughton noted that the orthopedist at UVA found that the MRI showed degenerative disk disease in the L5-S1 area. Waller reported a history of pain in his neck and lower back, although he stated that the pain in the lower back was worse and that he was not experiencing neck pain at the moment. On physical examination, Waller had no CVA tenderness and negative bilateral straight leg raise, but exhibited definite sacroiliac joint pain on the right. R. 332–33.

Waller, accompanied by his mother, visited with Robert Goodnight, M.D., on June 25, 2010. Waller's mother reported that he was not working, was eating less and losing weight, had crying spells, and felt tired all the time. She stated that Waller did not smoke, drink alcohol, or

---

[4] There is no radiology report from this procedure in the record, but the results of the MRI are described in ALJ Owen's opinion, R. 72. According to ALJ Owen, the lumbar spine MRI showed "'mild' disc desiccation at L4-5 with associated 'very small' foraminal protrusion on the right side. Spinal cord and nerve roots were unremarkable; and, there was no reported fracture, subluxation, or stenosis." *Id.*

use drugs.[5] He had previously taken Wellbutrin, Zoloft, Remeron, Celebrex, Ultram, and Flexeril for his physical and mental symptoms, but none of these were effective (although Waller's mother also stated that Wellbutrin and Zoloft may have helped somewhat). Findings on physical examination were again unremarkable, with normal range of motion of the spine, no evidence of scoliosis, no CVA tenderness, normal strength and sensation, and normal gait. Dr. Goodnight prescribed Zoloft for dysthymia and ordered laboratory screenings for possible thyroid and endocrine disorders. R. 329–31.

Waller returned to Dr. Goodnight on September 3. His mood remained low, and he reported staying in his room a lot. Waller stated that he saw a psychiatrist, but Dr. Goodnight noted that it did not appear as though Waller visited the psychiatrist regularly. He had a somewhat flat affect and denied use of alcohol and drugs. Waller still complained of chronic pain. His lab work showed liver and kidney issues. Findings on examination were fully normal except for flat, restricted affect. Dr. Goodnight ordered further lab work for renal insufficiency, continued Waller on Zoloft, and prescribed Abilify. R. 327–28.

> 2. *Medical Opinions*

> a. *Dr. Blackmer*

On December 2, 2009, DDS consulting examiner Dana R. Blackmer, Ph.D., conducted a mental status examination of Waller. R. 309–12. Waller told Blackmer that he experienced back pain, but did not suffer from any other physical problems. He reported that he did not take any medication for his mental symptoms at the time, but had taken an antidepressant in the past. Waller denied substance abuse and stated that he had never been in a psychiatric hospital, but had received outpatient treatment for depression. With regard to his mood, Waller stated that he

---

[5] In spite of this report, Waller's social history reflects that smoked two packs per day and used alcohol occasionally. R. 329.

6

felt "down a lot," but claimed that he rarely had crying spells. Waller also had difficulty eating, possibly causing him to lose weight, and difficulty initiating and maintaining sleep, which he attributed to both his physical and mental symptoms. He stated that he had less energy and social interest than normal, and he claimed that he had experienced depressive symptoms on and off for years, but denied suicidal thoughts. R. 309.

Waller reported that he went to school through tenth grade, took special education classes, repeated two years, and was unsure what kind of grades he got. He stated that he had difficulty reading and writing, to the point where he would have difficulty reading a newspaper well enough to understand it. Waller reported that he worked in a mill for one year before stopping because of his auto accident, and he stated that at this time he needed help with managing his money. He told Dr. Blackmer that he never married or lived independently and that he currently lived with his mother. Waller stated that on a typical day he would watch television, stay inside, and help his family around the house. He did not know how to cook, but could do laundry, although he did not do this by himself. Waller also informed Dr. Blackmer that he never attempted to obtain his driver's license. R. 309–10.

On examination, Dr. Blackmer observed that Waller was casually dressed and adequately groomed. He did not exhibit unusual speech, gait, or motor movements, and he was oriented to person, place, time, and situation. His thought processes were logical and rational, with no signs of psychosis or thought disorder. Waller's mood was within normal limits, although Dr. Blackmer observed that he rarely smiled. His concentration and attention were fair, short- and long-term memory were fair, abstract reasoning was poor, and common sense reasoning and judgment capacity were fair. As to Waller's intelligence, Dr. Blackmer estimated that he

functioned in the low end of the borderline to the upper end of the extremely low range. R. 310–11.

Dr. Blackmer found that Waller's reports of functional impairment were internally consistent and were consistent with his treatment history and the available collateral information. She recorded a diagnosis of major depression, recurrent, mild to moderate, without psychotic features, and assessed a Global Assessment of Functioning ("GAF") score of 50.[6] She opined that Waller would have no difficulty with simple and repetitive tasks, but he would have mild to moderate difficulty and would require additional or special supervision with detailed or complex tasks. Dr. Blackmer found that Waller would have no difficulty accepting supervision or instruction or dealing with coworkers and the public. She determined that he would have mild to moderate difficulty completing a normal workday, and he would have moderate difficulty with maintaining regular workplace attendance, working consistently over time, and dealing with the usual stress in a competitive workplace. She expressed a fair prognosis for significant change, and stated that Waller would not be capable of managing his financial affairs. R. 311–12.

> b.    Dr. Buchner

---

[6] GAF scores represent a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (*DSM-IV*). The GAF scale is divided into ten 10-point ranges reflecting different levels of symptoms or functioning, with 1–10 being the most symptomatic or least functional, and 91–100 being the least symptomatic or most functional. *See id.* The ranges do not distinguish between symptoms and functional impairments. *See id.* Thus, when "the individual's symptom severity and level of functioning are discordant, the final GAF [score] always reflects the worse of the two." *Id.* at 32–33. A GAF score of 41–50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.* at 34.

The American Psychiatric Association now cautions that GAF scores do not adequately convey the information needed to assess an individual's mental state, functional capacities, or treatment needs over time, and it recommends that clinicians cease using them for assessment. *See* Am. Psychiatric Ass'n, *Frequently Asked Questions About DSM-5 Implementation—For Clinicians* (Aug. 1, 2013), http://www.dsm5.org/Documents/FAQ%20for%20Clinicians%208-1-13.pdf. Though GAF scores may be questionable diagnostic tools, changes in assessed scores may still reflect a clinician's observation of improvement or deterioration in their patient.

8

DDS consulting physician Julie Buchner, M.D., examined Waller on December 5, 2009. R. 303–08. With regard to his back pain, Waller told Dr. Buchner that he attended physical therapy and met with an orthopedic surgeon following his 1999 motor vehicle accident. Waller stated that the orthopedic surgeon offered to perform back surgery, but could not guarantee that it would be totally successful, and he therefore declined to go through with surgery. He stated that he continued to have back pain located around the area of L3-L4 and radiating to his legs and shoulders, which rated 10/10 in intensity. Ibuprofen and Tylenol provided some pain relief. R. 303.

As to his depression, Waller stated that he took special education classes in high school and was evaluated for depression around this time. He denied being hospitalized or attempting suicide and stated that he had no plans to hurt himself or others, although the thought had crossed his mind. Waller described feeling sad most days and experiencing frequent feelings of guilt, worthlessness, helplessness, and hopelessness. He claimed that he had difficulty getting out of bed because of his mood. R. 304.

Waller told Dr. Buchner that he could feed, bathe, dress, and use the toilet himself. He was able to do some cooking and cleaning, but was limited by his back pain. Waller stated that he could not perform yard work or play basketball, which he used to enjoy. He reported that he smoked one-half pack of cigarettes per day, occasionally drank alcohol, and did not use illicit drugs. He described having shortness of breath when he experienced panic attacks. *Id.*

Dr. Buchner observed that Waller could ambulate without difficulty, sit comfortably, and get on and off the examination table with ease, but he also exhibited discomfort while taking off his shoes. On examination, Dr. Buchner found that Waller's coordination was normal, but he squatted with some difficulty because of his pain. He had normal flexion and extension of the

cervical and lumbar spine and limited right and left lateral flexion and rotation. He also exhibited some limited range of motion of the hips. He experienced pain on palpation over his entire spine that did not localize anywhere, and Dr. Buchner did not appreciate any paravertebral muscle spasm or spiny deformity. Waller's motor strength, sensation, and reflexes were all normal. He appeared drowsy but oriented, was slow in answering questions and obeying commands, and had flat affect. R. 305–06, 308.

Dr. Buchner expressed difficulty assessing the nature of Waller's back pain because she had no imaging and little objective findings to evaluate. She opined that he could have some sort of disc pathology or possibly early degenerative changes that she could not appreciate. She found that Waller's depression was moderate in degree. Dr. Buchner determined that Waller had the functional capacity to stand or walk six hours and sit six hours in a normal workday, without any need for an assistive device. He could lift or carry twenty pounds occasionally and ten pounds frequently. She determined that Waller would have unspecified postural limitations because of his back pain, but no manipulative, environmental, or workplace limitations. R. 306–07.

### 3. ALJ Owen's Decision

In his decision denying Waller's first application for benefits, ALJ Owen found that Waller had severe impairments of disorders of the spine, affective disorder, and borderline intellectual functioning, R. 69–72, and that these impairments did not meet or medically equal a listed impairment, R. 72–75. With regard to Waller's back pain, ALJ Owen observed that there was evidence of degenerative disc disease in the lumbar spine, although these findings were mild, and that there was no objective evidence of any abnormality in the cervical spine. R. 72. As to Waller's mental impairments, the ALJ found no more than moderate limitations in activities of

10

daily living, social functioning, and concentration, persistence, or pace, as well as no listing-level cognitive impairment. R. 73–74.

He found that Waller had the RFC to perform light work, although he could only occasionally climb, balance, stoop, kneel, crouch, or crawl. The ALJ further determined that Waller would need additional supervision to perform detailed or complex tasks, would have some difficulty dealing with stress and maintaining regular workplace attendance, and would have mild to moderate difficulty completing a normal workday, but also that he could perform simple, repetitive tasks in a low-stress environment and would have no difficulties dealing with coworkers and the public. ALJ Owen found that Waller's subjective descriptions of his limitations were not supported by the generally mild objective evidence and that Waller's limited activities of daily living were not likely attributable to his medical condition. He gave great weight to Dr. Blackmer's assessment of mental functioning and to Dr. Buchner's opinion of Waller's physical limitations. R. 75–78. The ALJ determined that Waller could not perform his past relevant work as an elevator operator, which was classified at a medium level of exertion, but could perform other unskilled light work. R. 78–79.

B.    *After the Alleged Onset Date*

1.    *Treatment Records*

The first evidence of treatment following Waller's alleged onset date of September 25, 2010, is a November 18, 2010, visit with Dr. Goodnight for treatment of cold symptoms. Dr. Goodnight diagnosed acute bronchitis and prescribed azithromycin and Symbicort, but he did not make any findings relating to Waller's back or his mental health issues. R. 325–26. Similarly, Dr. Goodnight made no comment about these conditions when he treated Waller in January 2011 for a rash. R. 323–24. On February 10, Waller reported to Dr. Goodnight with complaints of

11

difficulty sleeping and requested medication for his back pain. Findings on physical examination were unremarkable, with normal range of motion of the spine, no evidence of scoliosis, no CVA tenderness, full strength and sensation in the extremities, and normal gait. Dr. Goodnight prescribed carbamazepine and Naprelan for Waller's pain. R. 321–22.

Waller returned to Dr. Goodnight on May 13 with complaints of chest pain and an upset stomach, but he did not exhibit any symptoms related to his back or mental health on examination. R. 319–20. Waller next visited Dr. Goodnight on November 28, at which time he requested counseling and complained that his Zoloft caused diarrhea and Abilify was too expensive. Waller described having poor memory, trouble concentrating, difficulty sleeping and eating, and stated that he had been hearing voices. He stated that he did not drink or use drugs. Waller also complained again of his back pain. Examination of Waller's back was unremarkable, as were neurological and psychological findings. Dr. Goodnight took Waller off of Zoloft and Abilify and prescribed Wellbutrin and Seroquel. R. 314–16.

On September 20, 2013, Waller visited with Anupreet Oberoi, M.D., for medication management and treatment of his back pain. Dr. Oberoi diagnosed Waller with schizoaffective disorder, depressive type; back pain; and elevated liver function tests. She took Waller off of Omeprazole and Naproxen, refilled his Abilify, and prescribed Vimovo. R. 371–72. Waller returned to Dr. Oberoi on December 5, reporting that he had been seen at Danville-Pittsylvania Community Services and had been taken off of Abilify. Dr. Oberoi prescribed medication for hypertension and continued Waller on Seroquel, Zoloft, and Vimovo. R. 408–10.

On December 19, Waller visited with Douglas W. Shifflett, M.D., to address his abnormal liver enzymes. Dr. Shifflett noted that Waller tested negative for hepatitis and that a sonogram showed a slight heterogeneous pattern of the liver. He stated that Waller was a heavy

drinker in the past, had cut back in the last two years, and now drank primarily on weekends and went to Alcoholics Anonymous. Dr. Shifflett recommended Waller abstain from alcohol for the next few months to recheck his liver enzymes. Physical examination findings were unremarkable. R. 389–91. Waller returned to Dr. Shifflett on February 19, 2014, and reported having abstained from alcohol except on one occasion. Nonetheless, his liver enzymes had not improved. Dr. Shifflett discussed the dangers of continued drinking with Waller. Findings on physical examination were again fully normal. R. 386–87.

    2.    *Medical Opinions*

        a.    *Dr. Cousins*

DDS consulting examiner Christopher Cousins, Ph.D., assessed Waller's mental functioning on June 5, 2012. R. 339–44. Dr. Cousins observed that Waller was driven to the appointment by his mother—Waller gave little reason when asked why he did not have a license, other than to say he never got one—and that his hygiene and grooming were good. Waller shook hands when he met Dr. Cousins, but otherwise did not speak during their introduction. Dr. Cousins did not observe any abnormalities in Waller's gait, although he noted that Waller walked fairly slowly. Waller presented as somewhat guarded, provided vague responses to Dr. Cousins's questions, and exhibited flat affect and dysphoric mood. Dr. Cousins observed some psychomotor retardation. R. 339.

Waller told Dr. Cousins that he grew up with his parents and three siblings. He provided little explanation of his relationships with his family members other than to say they were "alright" and "ok." He described some history of mental illness and substance abuse in his family, including with his aunt, uncle, and father. Waller reported that he began taking special education classes in the tenth grade and that he quit school at this time. He stated that he had two

13

children, the younger of whom lived with him most of the time. He also explained that he worked as an elevator operator from 1999 until approximately 2001, at which time he quit because of pain from his automobile accident. He stated that he had been arrested in the past for trespassing and failure to pay child support, but could not recall when this happened. He also informed Dr. Cousins that he had a history of back pain and "damaged discs," chest pain, abdominal pain, dizziness, and shakiness. R. 340.

Dr. Cousins noted that Waller currently lived with his mother, and they got along "fine." Waller stated that he received food stamps and otherwise met his living expenses with contributions from his family. He explained that he had not tried to return to work since he quit after his injury. Waller told Dr. Cousins that he had suffered from depression since he was a child and since that time had not gone more than a day without experiencing symptoms. He endorsed other depressive symptoms as well, including insomnia, fatigue, and difficulty thinking. Waller was not taking prescription medication at the time, but he stated that he had taken Abilify and Wellbutrin in the past and took over-the-counter Tylenol for his pain. R. 341.

Waller admitted that he smoked marijuana as a teenager, but denied any current illegal drug use. He claimed to drink alcohol every other weekend, consuming approximately six beers at a time, which he said was not enough to get him intoxicated. He also stated that he smoked half a pack of cigarettes every day and drank soda on less than a daily basis. He had a poor appetite, but had not recently lost weight, and he had difficulty falling and staying asleep. He shared responsibilities for cooking and shopping with family members, and he was sometimes visited by friends, but never himself went to visit friends. On a typical day Waller would lay down and nap for the first part of the day and then wake up in the evening. He stated that he

14

usually just "lay around the house" and he typically went to bed between 3:00 and 4:00 a.m. R. 341–42.

Waller said that he was happy when he was around his children, but also felt sad quite often. He reported no delusional thought content, but endorsed visual and auditory hallucinations, which he described in vague terms. Waller was oriented to person, time, and place. His immediate memory was fair, recent memory was poor, and remote memory was good. Waller's general fund of information, judgment, and common sense reasoning ability were poor; abstract thinking ability was fair; and calculation ability was good. R. 342. Dr. Cousins found that Waller could perform basic activities of daily living and manage his own funds. He recorded a diagnosis of major depressive disorder, recurrent, moderate with psychotic features, and he assessed a GAF score of 55.[7] He did not find any evidence of malingering or symptom exaggeration, and he noted that Waller's endorsement of some psychotic features was not sufficient to warrant a diagnosis of a psychotic disorder. His prognosis was guarded. R. 343.

Dr. Cousins opined that Waller was capable of performing simple and repetitive tasks, but likely would not be able to perform detailed and complex tasks without special instructions or additional supervision. He noted that Waller's depression may cause some mild difficulty in maintaining regular workplace attendance, performing work activities on a consistent basis, and completing a normal workday or week without interruptions. Dr. Cousins did not expect that Waller would have difficulty accepting instructions from supervisors or interacting appropriately with coworkers or the public, but he would likely have mild difficulty coping with the typical stresses of competitive work. R. 344.

     *b.*    *Dr. Sanderlin*

---

[7] A GAF score of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or coworkers)." *DSM-IV* at 34.

DDS consulting physician James Sanderlin, M.D., examined Waller on September 29, 2012. R. 351–54. Waller informed Dr. Sanderlin that he had been depressed since childhood and he had taken medication for this in the past, but no longer could because he lacked insurance. He endorsed difficulty sleeping, fluctuating appetite, low energy, and depressed mood, but he denied suicidal or homicidal ideation or psychiatric hospitalization. Waller described vague hallucinations, but could not provide any detailed description. He took special education classes until he stopped school in the tenth grade, and he mentioned having worked for one year as an elevator operator. Waller also told Dr. Sanderlin that he had degenerative disc disease, but Dr. Sanderlin was unable to confirm this because the only imaging he could find in the record— Waller's 2009 lumbar spine x-ray—did not show any abnormalities. Waller stated that his back pain was caused by certain movements and that he did not take any medications for pain, but had obtained medication from friends in the past. R. 351.

Waller told Dr. Sanderlin that he could dress himself, but did not perform any chores. He stated that he lived with his mother and two children. He admitted to drinking alcohol on occasion, but he denied tobacco or illicit drug use. Dr. Sanderlin observed that Waller appeared to be intoxicated, noting that he had trouble opening his eyes except when spoken to and to laugh inappropriately. Waller ambulated without an assistive device and could get on and off the examination table without assistance. He did not appear to understand that he was being examined for a disability evaluation. His speech was fluent and comprehendible, and he exhibited no dysarthria. Waller had full range of motion throughout, no significant tenderness, negative straight leg raise bilaterally, and negative Spurling's test. He had normal strength and balance, full strength and reflexes, and intact sensation. R. 352–54.

Dr. Sanderlin noted that Waller had no documentation of a learning disability, and he stated that Waller's depression appeared to be mild. He explained that the examination was unreliable because Waller appeared to be intoxicated. Dr. Sanderlin opined that Waller had no limitations in his ability to stand, walk, or sit; could lift and carry fifty pounds occasionally and twenty pounds frequently; had no manipulative, postural, visual, or communicative limitations; and did not require an assistive device for ambulation. R. 353.

      *c.*    *Dr. Russell*

On April 7, 2014, Franklin E. Russell, Ph.D., conducted an intellectual assessment of Waller at the request of Waller's counsel. Waller told Dr. Russell that he had completed school up until the ninth grade, but he could not remember why he did not continue beyond that point. His mood was generally subdued, and his affect was consistent with his mood. Dr. Russell administered the Wechsler Adult Intelligence Scale, Fourth Edition, and observed that Waller appeared to give his best effort. Waller achieved a Verbal Comprehension Index of 72, a Perceptual Reasoning Index of 71, and a Full Scale IQ score of 73, which placed him in the borderline range of intellectual functioning. Dr. Russell stated that Waller's scaled scores ranged from the average to low borderline range, and he noted that these scores were consistent with a learning disability related to language and cognitive processing. He also noted that Waller manifested some difficulty with focus and concentration, and he opined that Waller could benefit from remedial education efforts. R. 411–13.

      *d.*    *DDS Reviewing Experts*

As part of the initial review of Waller's claim, DDS experts Martin Cader, M.D., and Richard Luck, Ph.D., assessed Waller's physical and mental functioning, respectively. R. 95–99. On April 19, 2012, Dr. Cader opined that Waller could lift or carry twenty pounds occasionally

and ten pounds frequently, could stand or walk for six hours and sit for six hours out of an eight-hour workday, and would not have any postural limitations. R. 97–98. On June 14, 2012, Dr. Luck determined that Waller had mild restriction of his activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. R. 95–96. Dr. Luck found that Waller was markedly limited in his ability to understand and remember detailed instructions, noting that he would have difficulty with detailed and complex tasks without the aid of special instructions or additional supervision, but that he had no significant limitations in his ability to understand and remember very short or simple instructions. R. 98. Dr. Luck also determined that Waller was markedly limited in his ability to carry out detailed instructions and moderately limited in his ability to maintain attention and concentration for extended periods, and he noted that Waller would have mild difficulty maintaining regular attendance, performing work acitivities on a consistent basis, and completing a normal workday or work week without interruptions. R. 98–99.

On October 5, 2012, DDS experts Tony Constant, M.D., and Alan D. Entin, Ph.D., assessed Waller's physical and mental functioning, respectively, on reconsideration. R. 110–14. Dr. Constant reaffirmed Dr. Cader's physical RFC determination with regard to Waller's ability to sit, stand, and walk and the absence of postural limitations, but also found less restrictive exertional limitations, opining that Waller could lift or carry fifty pounds occasionally and twenty pounds frequently. R. 112. Dr. Entin reaffirmed all of the mental limitations that Dr. Luck had found on initial review. R. 110, 113–14.

### 3.    *Waller's Submissions and Testimony*

Waller and his mother, Lois Waller, submitted function reports as part of his disability application. R. 210–20, 239–46, 255–65. In their reports, they stated that Waller often slept

18

throughout the day and had difficulty sleeping at night. R. 211–12, 239–40, 256–57. They reported that Waller needed assistance with caring for his hair and shaving, R. 212, 240, 257, and that he needed to be reminded to take his medications, do chores, and tend to his personal needs, R. 212–14, 240–41, 258. Waller, with help from family members, cooked occasional meals using a microwave, did laundry, shopped for groceries once or twice per month, and cared for his children. R. 211, 213–15, 240–41, 243, 256, 258–60. He struggled with stress and anxiety, rarely socialized, and had difficulty paying attention. R. 216–18, 242–45, 261–63. Waller and his mother also claimed that his back pain caused limitations in walking, standing, lifting, sitting, climbing stairs, kneeling, bending, and squatting, and that it restricted him from doing some chores. R. 214, 216–17, 241, 243–44, 259–62.

At his administrative hearing, Waller testified that he lived with his mother, aunt, and younger son; received financial assistance from family members and food stamps; and needed help from friends and family to get around. R. 45. He stated that he had gotten his GED and that he stopped working in 2000 because of his back pain. R. 45–47. Waller claimed that his pain originated in his lower back and moved down through his legs or buttocks and stated that the pain was made worse by stooping down and by sitting or walking for too long. He testified that his pain was improved by lying down and by taking medication. R. 47–48.

Waller claimed that because of his depression, he became easily irritated and preferred to keep to himself. R. 47. He stated that Zoloft helped to an extent, but also made him drowsy. R. 48–49. He testified that he smoked cigarettes, although he could not really afford them, and that he smoked more often when he was stressed or irritated. He also denied alcohol and drug use. R. 49–50. When Waller's counsel pointed out that his speech was "a bit blurred and vague," Waller explained that this was the way he normally talked and that people often thought he was

19

Case 4:15-cv-00034-JLK-JCH   Document 17   Filed 10/19/16   Page 19 of 29   Pageid#: 507

intoxicated. R. 54. He stated that he repeated two grades and eventually dropped out of school because of his depression and difficulty paying attention. R. 54–55.

As to his limitations, Waller claimed that he could sit (although this made his back sore), could not walk far, and could stand in place only for about ten minutes. R. 50. He stated that he could lift a carton of milk when he went shopping and could carry grocery bags if he was assisted, but also testified that postural activities such as kneeling, crouching, and crawling could irritate his back to the point where he would need to lie in bed for a few days. R. 50–51. Waller stated that when he was at home, he mostly watched TV, talked to family members, and did some chores with help from his family. R. 52–53. He felt that his depression was the more disabling of his impairments. R. 55.

C.    *ALJ Peltzer's Decision*

ALJ Peltzer found that in spite of Waller's functional limitations, he was still able to perform work and therefore was not disabled. In considering the criteria for Listings 12.04 and 12.05, she found that Waller had mild restriction in activities of daily living, moderate difficulties in social functioning, and no more than moderate difficulties with regard to concentration, persistence, or pace. R. 16. With regard to Waller's concentration, persistence, and pace limitations, the ALJ acknowledged that he had "some difficulty with focus and concentration and had evidence of some type of learning disability related to language and cognitive processing." *Id.* She also noted Dr. Cousins's opinion that Waller could not perform detailed and complex tasks without additional assistance and that his depression would cause mild difficulty in maintaining regular attendance, consistently performing work activities, and completing work without interruptions. Ultimately, she concluded that the record as a whole

20

supported no more than moderate limitations in this category and placed great weight on the opinions of the DDS examiners. *Id.*

In her discussion of Waller's RFC, the ALJ stated that she found his statements concerning the intensity, persistence, and limiting effects of his symptoms to be not entirely credible. R. 20. Specifically, she determined that Waller had made inconsistent statements that "significantly dimishe[d] his credibility." R. 32. The ALJ found inconsistencies between Waller's testimony that he had obtained his GED and his statement to Dr. Russell that he had only completed school to the ninth grade, as well as between his testimony that his family members did the chores around the house and his statement to Dr. Blackmer that he helped his family out with the chores. In addition she determined that Waller's reports to his treating physicians that he did not drink or only occasionally used alcohol were inconsistent with Dr. Shifflett's treatment notes, which reflected heavy past alcohol use. *Id.*

ALJ Peltzer gave "considerable weight" to ALJ Owen's decision, finding "it does not appear that much has changed" since that decision was issued. R. 32. She also found, however, that based on Dr. Sanderlin's findings the record no longer supported limitations in balancing or stooping. She also modified ALJ Owen's findings regarding Waller's mental limitations to provide additional clarity and to account for "the limitations posed by the various psychologists who have examined [Waller]." *Id.*

As to the medical opinions, ALJ Peltzer found that none of the treating or examining physicians found greater limitations than those she set forth in her RFC. She gave great weight "to the psychological consultative examiner's findings and opinions in limiting [Waller] to unskilled work where the pace of productivity is outside his control and with no tandem work assignments," and she pointed to the language limitations found in Waller's "recent consultative

Case 4:15-cv-00034-JLK-JCH   Document 17   Filed 10/19/16   Page 21 of 29   Pageid#: 509

examination" as providing support for limiting him to occasional contact with the general public. *Id.* She also gave partial weight "to the opinion of the medical consultative examiner and State agency consultants, especially the nonexertional limitations, although more weight has been given to the prior administrative decision as to overall level." *Id.*

IV. Discussion

On appeal, Waller argues that the ALJ's RFC determination is not supported by substantial evidence. Specifically, Waller contends that the ALJ erred by improperly weighing and considering the medical opinion evidence, Pl. Br. 8–9, ECF No. 14, omitting certain limitations from her RFC and corresponding hypothetical, *id.* at 9–14, and finding Waller's statements about his limitations not fully credible, *id.* at 14–16.

A.    *Credibility*

When evaluating a claimant's allegation that he is disabled by symptoms, such as pain, caused by a medically determinable impairment, the ALJ must first determine whether objective medical evidence shows that the claimant has a medically determinable impairment that could reasonably be expected to cause the kind and degree of pain alleged. 20 C.F.R. § 416.929(a); *see also Craig,* 76 F.3d at 594. If the claimant clears this threshold, then the ALJ must evaluate the intensity and persistence of the claimant's pain to determine the extent to which it affects his physical or mental ability to work. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *see also Craig,* 76 F.3d at 595. The latter analysis often requires the ALJ to determine "the degree to which the [claimant's] statements can be believed and accepted as true." SSR 96-7p, 1996 WL 174186, at *2, *4. The ALJ cannot reject the claimant's subjective description of his pain "solely because the available objective medical evidence does not substantiate" that description. 20 C.F.R. § 416.929(c)(2). A reviewing court will defer to the ALJ's credibility determination

22

except in "exceptional circumstances." *Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Edelco, Inc. v. NLRB*, 132 F.3d 1007, 1011 (4th Cir. 1997)). "Exceptional circumstances include cases where a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all." *Edelco*, 132 F.3d at 1011.

Here, the ALJ found that Waller's credibility was significantly undermined by inconsistencies between his testimony and statements found elsewhere in the record. Of course, it is well recognized that a witness's prior inconsistent statements can be used to impeach his or her testimony. *See Vest v. Colvin*, No. 5:13cv67, slip op. at 52 (W.D. Va. July 17, 2014) (collecting cases), *adopted by* 2014 WL 4656207, at *2–3 (W.D. Va. Sept. 16, 2014); *cf. United States v. Hale*, 422 U.S. 171, 176 (1975) ("A basic rule of evidence provides that prior inconsistent statements may be used to impeach the credibility of a witness."). Nonetheless, the inconsistencies identified by the ALJ are simply not adequate to support her conclusion that Waller's credibility with regard to his pain was "significantly diminished."

For instance, Waller's testimony that his family helped with the chores, including cooking and laundry, was not inconsistent with his other statements in the record that he could perform this work with assistance. Likewise, his statements to the treating and examining physicians that he left school after the ninth or tenth grade are not inconsistent with his testimony to the ALJ that he obtained his GED, nor are his statements to his physicians that he never or occasionally drank alcohol at the time necessarily inconsistent with Dr. Shifflett's notes that Waller drank heavily in the past. Thus, all three of the reasons provided in the ALJ's credibility analysis do not withstand scrutiny. Because the ALJ's rationale for significantly discrediting

23

Waller's entire testimony was unreasonable, her credibility finding is not supported by substantial evidence.

B.     *Functional Limitations and Opinion Evidence*

Waller argues that the ALJ's omissions of particular functional limitations from her RFC finding were either done in error or inadequately explained in her discussion of the evidence, including her evaluation of the medical opinion evidence. With regard to his physical limitations, Waller argues that ALJ Peltzer erred by not adopting ALJ Owen's finding that he could only occasionally stoop. ALJ Peltzer explained that she did not adopt this limitation because the record no longer supported a conclusion that Waller's back impairment caused postural limitations. She relied on Dr. Sanderlin's finding of no postural limitations and his finding that Waller's November 2009 X-ray showed no abnormalities. R. 32.

Although findings made by the Social Security Administration ("SSA") in a claimant's earlier application for benefits will not have preclusive effect as to subsequent applications, *Albright v. Comm'r of Soc. Sec.*, 174 F.3d 473, 476–78 (4th Cir. 1999), an ALJ must "consider such finding[s] as evidence and give [them] appropriate weight in light of all relevant facts and circumstances" in the record before her, SSAR 00-1(4), 2000 WL 43774, at *4 (Jan. 12, 2000) (interpreting *Albright*); *see also Dailey v. Colvin*, No. 4:14cv5, 2015 WL 877376, at *7–8 (W.D. Va. Mar. 2, 2015). In determining what weight to give to a prior finding, the adjudicator must consider (1) whether a fact on which the prior finding was based is subject to change over time; (2) the likelihood that such a change took place, taking into account "the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim;" and (3) the extent to which evidence not considered in the prior claim "provides a basis for making a different finding with respect to the period being adjudicated in

the subsequent claim." SSAR 00-1(4), 2000 WL 43774, at *4; *see also Dailey*, 2015 WL 877376, at *7.

In this case, ALJ Peltzer's reasons for declining to adopt ALJ Owen's finding of stooping limitations are insufficient. She did not explain whether Waller's back impairment was subject to improvement over time or in fact had improved. As Waller notes, the 2009 X-ray, which ALJ Peltzer relied on as proof that his back condition would not impose any limitation on his ability to stoop, was already in the record before ALJ Owen and was discussed in his opinion. R. 71. Furthermore, although Dr. Sanderlin's evaluation of Waller's physical limitations was new evidence that could have provided a basis for a different finding, the ALJ failed to address issues that potentially undermine Dr. Sanderlin's opinion. For instance, one of Dr. Sanderlin's reasons for assessing few physical limitations was that he could not find anything in the record to confirm Waller's diagnosis of degenerative disc disease. R. 351. Disc degeneration was observed, however, in Waller's January 2010 MRI. R. 332. Although this observation was only vaguely noted in a nurse practitioner's treatment notes, *see id.*, ALJ Owen described the MRI as showing mild disc desiccation, R. 72—a fact absent from ALJ Pelzer's written opinion. Considering these factual omissions, ALJ Peltzer did not adequately explain the departure from ALJ Owen's finding that Waller was limited in his ability to stoop as required *Albright* and therefore is not supported by substantial evidence.[8]

Waller also argues that the ALJ failed to account for a variety of limitations related to his difficulties in concentration, persistence, and pace. Pl. Br. 8–11, 12–14. Among his complaints, Waller asserts that the ALJ improperly gave partial weight to Dr. Blackmer's opinion. An ALJ

---

[8] I do not find persuasive Waller's argument that Dr. Sanderlin's and Dr. Buchner's opinions conflicted as to Waller's ability to stoop. Dr. Buchner opined that Waller had postural limitations, but she did not specifically identify stooping. Thus, their opinions are not necessarily contradictory on this functional ability.

25

must consider and evaluate all opinions from "medically acceptable sources," such as doctors, in the case record. 20 C.F.R. § 416.927. In addition to assessing Dr. Sanderlin's opinion, the ALJ provided the following discussion of the medical opinions:

> The mental limitations found herein take into account the limitations posed by the various psychologists who have examined the claimant.
>
> ….
>
> In sum, the above residual functional capacity assessment is supported by the longitudinal medical record and the medical opinions recounted herein. No treating or examining medical source has indicated that the claimant is more limited in work-related function than as found herein. Great weight has been given to the psychological consultant examiner's findings and opinions in limiting the claimant to unskilled work where the pace of productivity is not outside his control and with no tandem work assignments. Based on his recent consultative examination, he has been limited to occasional contact with the general public due to his language limitations. Partial weight has also been given to the opinion of the medical consultative examiner and State agency consultants, especially the nonexertional limitations, although more weight has been given to the prior administrative decision as to overall exertional level.

R. 32. This passage is difficult to follow as the ALJ did not identify which of the many examining physicians' or psychologists' opinions she was evaluating as she discussed them. Additionally, other than noting that Waller would be restricted in his contact with the public because of his language limitations, the ALJ offers no analysis or rationale for her conclusions as to the weight assigned to the medical opinions. This lack of explanation significantly frustrates the Court's ability to review the ALJ"s analysis. *See Monroe v. Colvin*, 826 F.3d 176, 188, 190–91 (4th Cir. 2016).

Moreover, ALJ Peltzer incorrectly found that none of the medical opinions imposed greater restrictions than those provided in the RFC. She did not address all of the relevant limitations identified in the medical opinions when formulating her RFC determination, nor did she discuss her reasons for departing from some of the mental limitations found by ALJ Owen.

26

Both Dr. Blackmer and Dr. Cousins found that Waller would have multiple difficulties in his ability to maintain workplace performance, including problems in performing detailed and complex tasks, dealing with job-related stress, completing a normal workday or week, maintaining regular attendance, and performing work tasks consistently. R. 311, 344. Some of these limitations are included in ALJ Peltzer's RFC assessment. Her findings that Waller was limited to simple work, with infrequent changes in tasks and without pace of productivity being fixed by an external source, effectively addressed Waller's difficulties with performing detailed or complex work and staying on task.[9] *See, e.g.*, *Parker v. Colvin*, No. 3:14cv502, 2015 WL 5793695, at *23 (E.D. Va. Sept. 29, 2015) (finding that RFC and hypothetical limiting claimant to "working in a non-production oriented environment" properly accounted for limitations in pace and ability to stay on task).

The RFC does not, however, specifically account for Waller's limitations in completing a normal workday and workweek, coping with stress, and maintaining regular attendance.[10] Thus, with regard to these limitations, the ALJ either accepted the opinions of the examining physicians, but neglected to reflect this in her RFC finding, or she rejected those opinions and

---

[9] Furthermore, in spite of Waller's argument to the contrary, Pl. Br. 12–14, the record provides no basis to require the ALJ to have drawn a distinction between work rated at "Reasoning Level 1" and "Reasoning Level 2." *See Chestnut v. Colvin*, No. 4:13cv8, 2014 WL 2967914, at *9–10, 22–23 (W.D. Va. June 30, 2014) (finding that a limitation to "simple, routine, repetitive tasks" is consistent with a Reasoning Level of 2 and rejecting the claimant's argument that the ALJ needed to draw a more precise distinction).

[10] Specifically with regard to attendance, the Commissioner cites to *Turner v. Colvin*, No. CV 15-0020 KES, 2015 WL 5708476 (C.D. Cal. Sept. 29, 2015). In *Turner*, the court affirmed an RFC determination that did not incorporate an express provision for absenteeism, despite a medical opinion in the record that included a "moderate" impairment in maintaining attendance. *Id.* at *3. The court explained that the attendance limitation was not necessary in part because other restrictions in the RFC "mitigated against the kinds of stressors likely to aggravate Plaintiff's mood and anxiety disorders and cause absenteeism." *Id.* at *4. *Turner*, which has now been appealed to the Ninth Circuit and which is not binding in this Court, is unpersuasive here, as it is not apparent from the record that Waller's difficulties with work pace are necessarily related to his ability to maintain attendance. Moreover, if that were the ALJ's rationale, she needed to say so and not leave it to the Court to speculate why she included some restrictions, but did not include other apparently relevant restrictions.

failed to explain her reason for doing so. In either case, her failure to explain why she did not include these limitations frustrates meaningful review. Moreover, in the prior decision, ALJ Owen assessed restrictions in Waller's ability to deal with stress, maintain regular workplace attendance, and complete a normal workday. R. 75. ALJ Peltzer did not explain why she departed from ALJ Owen's RFC as to these functions. Without an explanation of why these relevant functions were not included in the RFC, I cannot find that the ALJ's RFC determination is supported by substantial evidence. Although the ALJ thoroughly discussed the medical evidence and Waller's statements, she did not adequately explain why she assigned weight to the various medical opinions or explain how she assessed Waller's ability to perform relevant functions. *See Monroe*, 826 F.3d at 188, 190–91. The ALJ will have an opportunity to conduct a proper analysis on remand.

## V. Conclusion

For the foregoing reasons, I find that the ALJ's decision that Waller is not disabled is not supported by substantial evidence. Accordinlgy, I respectfully recommend that the presiding District Judge **GRANT** Waller's motion for summary judgment, ECF No. 13, **DENY** the Commissioner's motion for summary judgment, ECF No. 15, and **REMAND** this case for further administrative proceedings.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: October 19, 2016

Joel C. Hoppe
United States Magistrate Judge